## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CAROL ANN RIGGS,

       *Plaintiff*,

*v.*

COMMISSIONER OF SOCIAL SECURITY,

       *Defendant*.

_____/

CASE NO. 15-cv-10031

DISTRICT JUDGE LINDA V. PARKER
MAGISTRATE JUDGE PATRICIA T. MORRIS

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (Docs. 11, 12)

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Riggs is not disabled. Accordingly, **IT IS RECOMMENDED** that Riggs' Motion for Summary Judgment (Doc. 11) be **DENIED** and that the Commissioner's Motion for Summary Judgment (Doc. 12) be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claims for the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. § 401 *et seq.* and Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381 *et seq.* (Doc. 2; Tr. 1-3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 12).

Plaintiff Carol Riggs was fifty-two when she applied for benefits on June 25, 2012, alleging that she became disabled on August 1, 2011. (Tr. 145). This application was denied on October 15, 2012. (Tr. 65-66). The Commissioner considered other disorders of bone and cartilage (osteoporosis) and disorders of back, discogenic and degenerative as possible bases of disability. (*Id.*) Riggs requested a hearing before an Administrative Law Judge ("ALJ"), which took place before ALJ Oksana Xenos on September 15, 2013. (Tr. 24-33). Riggs, who was represented by attorney Alice Buffington, testified, as did vocational expert ("VE") Dr. Don Harrison. (*Id.*). On August 16, 2013, the ALJ issued a written decision in which she found Riggs not disabled. (Tr. 24-33). On December 2, 2014, the Appeals Council denied review. (Tr. 1-6). Riggs filed for judicial review of that final decision on January 6, 2015. (Doc. 1).

### B.    Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal citations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will

not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C.    Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

## D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Riggs not disabled under the Act. (Tr. 33). The ALJ found at Step One that Riggs may have engaged in substantial gainful activity since August 1, 2011, the application date, but chose not to decide the case at that step. (Tr. 26-27). At Step Two, the ALJ concluded that Riggs had the following severe impairments: "degenerative disc disease, degenerative joint disease, canal stenosis in the cervical spine, radiculopathy, obesity, carpal tunnel syndrome, and major depression." (Tr. 27). At Step Three, the ALJ found that Riggs' combination of impairments did not meet or equal one of the

4

listings in the regulations. (*Id.*). The ALJ then found that Riggs had the residual functional capacity ("RFC") to perform light work, except that Riggs

> needs to be able to change positions between sitting and standing at will in the workstation, is limited to simple repetitive work with only minimal changes in the work setting, and she cannot climb ropes or ladders or scaffolds, can only occasionally climb ramps and stairs, can occasionally stoop, kneel, balance, crouch, and crawl, can only occasionally do bilateral overhead reaching, can only occasionally do handling bilaterally, and cannot do work involving vibration or exposure to hazards such as unprotected heights and moving machinery.

(Tr. 29-32). At Step Four, the ALJ noted that Riggs could not perform any past relevant work. (Tr. 32). At Step Five, the ALJ found that a significant number of jobs exist which Riggs could perform despite her limitations. (Tr. 32-33). As a result, the ALJ found Riggs not disabled under the Act. (Tr. 33).

> ### E.    Administrative Record

> #### 1.    Medical Evidence

On November 6, 2010, Riggs visited Oakwood Inpatient Associates, and was seen by Dr. Catherine Foster. (Tr. 275-78). Riggs complained of hand swelling and lip swelling. (Tr. 276). Dr. Foster "encourage[d] the patient to ambulate, as she is perfectly mobile." (Tr. 278). Also on November 6, 2010, D.O. Christine Park interpreted a radiological study of Riggs' chest, which showed mildly enlarged cardiac size, and left basilar atelectasis. (Tr. 279).

On May 20, 2011, Riggs underwent a CT scan of her lumbar spine, which Dr. Jeffrey Tranchida interpreted as showing "[m]ild multilevel degenerative endplace and spondylitic [sic] degenerative changes without evidence of canal stenosis or focal disc abnormality," along

with "minimal bilateral neural foraminal narrowing at L4-L5" and "[m]ild/moderate degenerative changes also involv[ing] the bilateral sacroiliac joints." (Tr. 254).

Between March 4, 2010, and April 11, 2012, Riggs treated at the Rivera Medical Center approximately eleven times. (Tr. 257-68). These records are largely illegible due to poor penmanship and scanning quality. Those few legible words which appear in the records seem to suggest that Riggs was diagnosed with "lumbar pain" (Tr. 259), "low back pain" (Tr. 261), lumbar disc disease (Tr. 263), and other similar back maladies. Both parties cite these records only insofar as they corroborate Riggs' complaints of back pain. (Doc. 11 at 3-4; Doc. 12 at 3).

On August 4, 2011, Riggs visited the Great Lakes Pain Management Center complaining of worsening pain over the past year, including shooting pain in the lower back and lower extremities. (Tr. 241, 243). Riggs rated her pain at between seven and nine out of ten, including burning and numbness in the lower extremities which was exacerbated by activity. (*Id*.). Dr. Mohamed Osman found on physical examination that Riggs showed positive results for the lumbar facet loading test and straight leg test at seventy-five degrees, along with some tenderness bilaterally over the paraspinal muscles. (Tr. 242). Dr. Osman prescribed Vicodin and recommended several types of radiological testing to further diagnose Riggs' condition. (*Id*.). Finally, Dr. Osman provided a steroid injection to the lumbar medial branch. (Tr. 249).

On August 15, 2011, D.O. Aaron Gibson interpreted a radiological exam of Riggs' spine, which he found showed "[n]o acute fractures or malalignment," normal vertebral body heights, "[m]ild to moderate multilevel endplate degenerative changes with osteophytosis and

6

sclerosis worse in the mid and lower cervical spine." (Tr. 255). D.O. Gibson also found "[p]rominent disc height loss at C6-C7" with "[n]o prevertebral soft tissue swelling." (Tr. 255).

On September 21, 2011, D.O. Nancy Juopperi interpreted a nerve study, which showed that Riggs was experiencing "mild" carpal tunnel syndrome of the wrist, along with "[c]hronic C6-C7 radiculopathy on the right," and otherwise normal nerve conduction study results. (Tr. 252-53).

On November 4, 2011, Riggs complained of a hand injury resulting from the use of a box cutter at her workplace. (Tr. 360).

On December 29, 2011, Dr. Alnajjar recorded that Riggs experienced a wrist injury three weeks prior, resulting in tingling and nine out of ten pain with wrist motion or pressure, and reported that the pain was "sharp and continuous." (Tr. 356). He recommended physical therapy, and suggested that surgery might be necessary. (*Id*.).

On February 7, 2012, Riggs was treated by Dr. Jai Duck Liem, who performed an electromyogram and nerve conduction study. (Tr. 321). Dr. Liem found that Riggs' left arm and left cervical paraspinal muscles showed "normal characteristics in all sampled muscles," and that the nerve conduction study produced "abnormal findings" which were "compatible with mild left carpal tunnel syndrome." (*Id*.).

On March 20, 2012, Dr. Donald Conn interpreted an ultrasound of Riggs' abdomen, finding a "prominent" liver with "no focal mass," along with a renal cist, and "layering debris within the bladder" which he found could be "sediment or clot." (Tr. 284).

An April 18, 2012, Dr. Tranchida interpreted an MRI of Riggs' cervical spine, which revealed "[m]ultilevel spondylitic [sic] degenerative changes, most advanced at C5-C6 and C6-

C7," resulting in "central canal stenosis and effacement of the spinal cord," along with a potential "central disc protrusion with slight inferior migration at C5-C6." (Tr. 250-51).

Riggs visited Premier Orthopedics from December 29, 2011 to February 9, 2012, but the notes from that period are difficult to interpret due to poor scanning quality. (Tr. 326-343). From what can be discerned, Riggs was found to have "median nerve compression" (Tr. 327), that she elected for a cast in an attempt to avoid hand surgery" (*Id*.), and experienced wrist pain as high as eight out of ten (Tr. 328).

On March 8, 2012, Dr. Samer Alnajjar diagnosed weak grip and pinch strength on the left hand, along with allegedly limited motion due to pain. (Tr. 346). An electromyography test returned normal results. Dr. Alnajjar instructed Riggs to return to work when physical therapy ended on April 1, 2012. (Tr. 348).

Discharge notes drafted by a therapist at Premier Orthopedics Physical Therapy on February 12, 2012, include a notation that, even following completion of her physical therapy regimen, Riggs experienced pain which she rated at eight out of ten, and had not met her goals as to pain or point tenderness. (Tr. 349). Dr. Alnajjar confirmed in February 2, 2012, treatment notes that Riggs reported "little benefit" from physical therapy. (Tr. 352). On that date, Riggs opted to have Dr. Alnajjar apply a "cast to immobilize" her arm in an attempt to avoid surgery. (*Id*.).

On March 19, 2012, Riggs visited the Great Lakes Pain Management Centers to treat with Dr. Ossman. (Tr. 363-67). Riggs complained of back, knee, and shoulder pain, and asserted that her pain level was seven out of ten. (Tr. 363). She also complained of depression, weight gain, shortness of breath, and loss of appetite. (*Id*.). However, Riggs asserted that the

8

use of pain medication reduced her pain to two out of ten. (Tr. 364). Riggs also asserted that she was experiencing "new pain in both legs." (Tr. 365).

On August 7, 2012, Riggs complained to Dr. Ossman of pain in her neck, hands, knees, and ankles. (Tr. 367). She rated her pain at between four and ten out of ten. (*Id*.). Riggs also completed a form on that date in which she indicated that her pain relief was adequate, that an "acceptable" level of pain was a seven or eight out of ten, that her pain level that day was a six out of ten, and that with medication she experienced a pain level of about three or four out of ten. (Tr. 368).

On July 10, 2013, Riggs treated with D.O. Ramsey Hammoud at Premier Orthopedics. (Tr. 425). Riggs acknowledged that she suffered from arthritis of the knees, but rejected an offered injection because she "just received a spine injection because of degenerative disc disease." (*Id*.). D.O. Hammoud noted knee pain and crepitus, but without any sensory or motor deficits; he recommended physical therapy and the continued use of opioid pain relievers. (*Id*.). On July 27, 2013, Riggs treated with Dr. Suleiman at Premier Orthopedics. (Tr. 423-24). Riggs complained of "bilateral knee pain," particularly in the right knee, and particularly upon ambulation or use of stairs. Dr. Suleiman found no acute distress, no swelling, no gross deformity, and noted that Riggs was sitting comfortably on the exam table. (Tr. 424). However, he noted that her knees were positive for the grind test, and he ultimately diagnosed bilateral knee unicompartmental osteoarthritis, and administered a pain relieving injection and prescribed physical therapy. (*Id*.).

Because Riggs does not allege that the ALJ erred in assessing her mental health, the Court will endeavor to summarize her lengthy mental health records for the purpose of

providing background to her claim. Between 2012 and 2013 Riggs sought treatment for mental health concerns at Community Care Services ("CCS"). (Tr. 370-411). In 2012, Riggs attributed her depression to the loss of her job following her hand injury at work, being evicted from her home, and the death of her mother. (Tr. 390). In January 2013, Dr. Timothy Chapman diagnosed Riggs with moderate majordepressive disorder. (Tr. 370). Throughout early 2013, Riggs expressed some idle thoughts of suicide without a plan, and also complained of being in a "dark place," including poor sleep, lack of motivation to care for herself or go outside, self-isolation, and sometimes hearing "a voice in her head telling her to harm herself." (*See*, *e.g.*, 377-79, 384). In March 2013, Riggs complained of worsening depression related to the loss of her job and fears about losing her house. (Tr. 371). In April 2013, Riggs reported experiencing some suicidal ideation resulting from difficulties with her daughter. (Tr. 408). In May 2013, a social worker at CCS recorded that Riggs' mood and affect was happy; that she was oriented to time, place, and person; that she had some difficulty sleeping; that she was not suffering any memory or concentration limitations; that she "continued to hear voices but she [did] not focus on them;" and that she "has been walking three miles every day." (Tr. 405).

### 2.    Medical RFC Assessments

On October 4, 2012, Dr. Murari Bijpuria rendered a RFC assessment, finding Riggs capable of occasionally lifting twenty pounds and frequently lifting ten pounds; standing, walking, or sitting six hours in an eight-hour workday; pushing or pulling an unlimited amount; that she could climb, balance, stoop, kneel, crouch or crawl occasionally, but that she could never climb ladders, ropes, or scaffolds. (Tr. 308). Dr. Bijpuria also found that Riggs was limited in reaching in all directions, and handling in terms of gross manipulation, but was

unlimited in terms of fingering and feeling. (Tr. 309). Dr. Bijpuria assessed no visual or communicative limitations, and found that Riggs should avoid even moderate exposure to machinery and height hazards. (Tr. 310). Finally, Dr. Bijpuria assessed that Riggs was only partially credible, and that Riggs' complaints were "not substantiated by the objective medical evidence alone," and that her "alleged limitation is not supported by reported function, longitudinal treatment record, [or] objective clinical findings. (Tr. 311).

On July 12, 2013, Dr. Jiab Suleiman drafted a RFC assessment of Riggs. (Tr. 412-17). Dr. Suleiman asserted that he treated Riggs on a monthly basis, but did not specify the length of that treating relationship. (Tr. 413). He found that Riggs' prognosis was "fair," and that she complained of "pain, weakness and decreased range of motion (bil[ateral] knees)." (*Id.*). He asserted that Riggs was not a malingerer, and that her physical impairments were reasonably consistent with the symptoms described in the evaluation. (Tr. 414). He asserted that Riggs' pain would constantly interfere with her ability to concentrate, and that she was incapable of even a low-stress job, which he attributed to her "constant" pain and medication "which may cause drowsiness and nausea." (*Id.*). He found that Riggs could walk half a mile without rest, could sit for thirty minutes, and could stand for fifteen minutes. (*Id.*). Dr. Suleiman stated that Riggs could walk, stand, or sit for less than two hours in an eight-hour workday. (Tr. 415). Further, he found that Riggs must walk every forty-five minutes for about fifteen minutes, and that Riggs would require the ability to change postural positions at will and take breaks each hour for fifteen to twenty minutes. (Tr. 415). He also concluded that Riggs must use a cane when standing or walking. (*Id.*). With regard to lifting weights, Dr. Suleiman stated that Riggs could lift less than ten pounds frequently, ten pounds occasionally, and could never lift more

11

than twenty pounds. (*Id.*). Regarding neck movement, Dr. Suleiman simply wrote "N/A" rather than checking a box, indicating either that he did not evaluate that area of functioning, or that Riggs was not limited in that area of functioning. (Tr. 416). With regard to other postural limitations, he again wrote "N/A" in regard to twisting, but indicated that Riggs could "occasionally" stoop and climb stairs, and could "rarely" crouch/squat and climb ladders. (*Id.*). Finally, Dr. Suleiman recorded that Riggs was likely to miss more than four days of work per month. (*Id.*).

On July 25, 2013, Dr. Alnajjar also completed a RFC assessment. (Tr. 418-422). He indicated that he treated Riggs on a monthly basis, but did not indicate over what period. (Tr. 419). Dr. Alnajjar asserted that Riggs suffered from tendonitis in the right wrist, with a "good" prognosis. (*Id.*). Dr. Alnajjar also indicated that Riggs was not a malingerer, and that her impairments were reasonably consistent with her symptoms and functional limitations. (Tr. 420). Her ailments would "frequently" interfere with her attention and concentration in performing even simple work tasks, but she was capable of performing low stress jobs. (*Id.*). He asserted that Riggs could walk five city blocks without rest, and that she could sit, stand, or walk for at least six hours. (Tr. 421). He asserted that she would not require "periods of walking around during an 8-hour working day," and would not be required to shift at will from sitting to standing or walking. (*Id.*). However, she would need to take unscheduled breaks. (*Id.*). Dr. Alnajjar stated that Riggs could "never" lift any weight. (*Id.*). He also asserted that she could move her neck without limitation. (*Id.*). Riggs could also frequently twist, stoop, crouch, and climb ladders and stairs. (Tr. 422). He found that Riggs had significant repetitive fingering, handling, or reaching limitations, and could never use her right upper extremity for

turning objects, reaching, or fine manipulation. (*Id.*). Finally, he found that Riggs would be absent from work more than four days per month. (*Id.*).

### 3.    Application Reports and Administrative Hearing

#### a.    Riggs' Function Report

Riggs completed a function report on June 29, 2012. (Tr. 184-91). There, Riggs asserted that she "cannot bend down because of my back problem [and] recently my knees are bone to bone and I get injections in my knees and back." (Tr. 184). Riggs said that she spent her days taking "short walk[s]," taking her medication, and watching television. (Tr. 185). Riggs asserted that she takes care of her daughter, who is bipolar, and that a friend provides both Riggs and Riggs' daughter with assistance. (*Id.*). Riggs noted that prior to her illness she could "walk long ways," and "bend my body." (*Id.*).

Riggs wrote that she is unable to button her clothes, has trouble getting out of the tub, cannot comb her own hair, and must hold onto something when using the toilet because of her illnesses. (Tr. 185). Riggs noted that she sometimes cooks meals "depend[ing] on how [her] back is feeling," and thus prepares meals only once or twice a month. (Tr. 186). She does not perform house or yard chores, and stated that she "need[s] help with everything" because of the limiting effects of her back pain. (Tr. 186-87). While she does not drive, Riggs stated that she shops in stores twice a month for "hours" to acquire food and household products. (Tr. 187). Riggs stated she can pay bills, but does not manage a savings account due to a lack of funds. (*Id.*). She also stated that she "can pay attention," and "can follow instructions," including following spoken instructions "very well." (Tr. 189).

13

In terms of social relations, Riggs said that she visits friends at their homes or joins them for dinner twice monthly, and that she attends church weekly. (Tr. 188). However, she also asserted that she does not "go out to have fun anymore because of my back." (Tr. 189).

Riggs wrote that her ailments limit all postural activities, including standing and walking, but does not limit any of her mental functions, including memory or concentration. (Tr. 189). Riggs said she can walk one block and must rest for thirty minutes before resuming. (*Id.*). Finally, Riggs asserted that she performed factory work between June 2010 and February 2012. (Tr. 192).

**b.      Riggs' Testimony at the Administrative Hearing**

At the July 31, 2013, hearing before the ALJ, Riggs testified that she "does not" walk without a cane, can walk for only approximately one block with the aid of a cane, and generally cannot ambulate around her home without a cane. (Tr. 44). Regarding her past work, Riggs testified that she performed factory work in January 2012 for "maybe a week or so." (*Id.*). Riggs explained that she stopped working because of her ailments, including "a pinched nerve in my neck," knees which are "bone to bone," arthritis in the right ankle, two bulging discs, and arthritis of the spine. (Tr. 46). She also asserted that her hands sometimes get "stuck" and "numb," such that she has to "wait until it just open [sic] up by itself." (Tr. 47). Riggs testified that she could sit for about thirty minutes, stand for at least twenty minutes, and must lay down four to five times daily because of knee pain. (Tr. 48). She asserted that she must lie down for "half" of the day. (Tr. 53). Riggs said that she could not lift "anything," even clothing. (Tr. 48). Riggs also stated that her sleep is regularly interrupted because of knee or

14

back pain. (Tr. 50). She further claimed that her back and leg pain occurs "all day, every day," including following the administration of pain injections. (*Id*.).

Riggs testified that she goes shopping twice monthly, and relies on her daughter to perform laundry, vacuuming, and other chores. (Tr. 48-49).

Regarding psychological issues, Riggs testified that she began experiencing depression as a result of the loss of her job and home, and sought help when she became afflicted with thoughts of suicide. (Tr. 54). She also asserted that her depression has led to a sharp decline in her social activities, including visiting with friends. (*Id*.). Riggs also testified to concentration issues, which sometimes make her lose track of what she is doing. (Tr. 55).

### c.      The VE's Testimony at the Administrative Hearing

The ALJ then asked the VE a series of questions to determine Riggs' ability to perform work. (Tr. 57-61). The ALJ asked the VE to consider whether a hypothetical worker, who has the same education, age, and past work experience as Riggs could perform competitive work. (Tr. 57-58). Specifically, the ALJ asked the VE to hypothesize a person who has the ability to perform light work, and who:

> Cannot climb ladders, ropes or scaffolds. Can occasionally climb stairs and ramps, balance, stoop, kneel, crouch and crawl. Can occasionally reach overhead bilaterally. Can frequently handle bilaterally and should avoid hazards such as moving machinery and unprotected heights, and should also avoid vibration.

(*Id*.). The VE confirmed that such a worker could perform work as a counter attendant (1,800 jobs in Southeast Michigan), laundry sorter (2,000 jobs), and hand packer (2,500 jobs). (Tr. 80). The ALJ then further restricted the hypothetical worker's abilities, including that the worker "requires a sit/stand at will option at the work station." (Tr. 58). The VE confirmed that

15

such a worker could perform work in the "inspecting category" (1,200 jobs), and the "packing" category (1,500 jobs). (*Id.*). The ALJ next asked whether including a limitation to "occasional handling bilaterally rather than frequent" would alter the VE's findings. (Tr. 58-59). The VE testified that such a limitation would not preclude work as a school bus monitor (1,200 jobs) or amusement monitor (1,000 jobs). (Tr. 59). The ALJ also asked whether a limitation to "unskilled, simple, repetitive work with only minimal changes in the work setting" would have any impact on the listed jobs; the VE confirmed that it would not. (*Id.*). Finally, the ALJ asked whether an individual who was off task twenty percent of the day, and who is unable to sit, stand or walk for a total of eight hours, five days a week could perform competitive work; the VE confirmed that such a restriction would eliminate all competitive work. (Tr. 59-60).

Riggs' attorney then asked the VE whether an individual who was "unable to lift any weight and had no use of their right dominant hand for grasping and turning and twisting, no use of the right fingers for fine manipulation or right arm for reaching" would be able to perform any competitive work; the VE confirmed that such a restriction would preclude all work. (Tr. 60). Riggs' attorney also asked whether a worker who is absent four or more days per month could perform competitive work; the VE confirmed that such a worker could not. (Tr. 61).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical

16

sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). *See also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-3p, 2006 WL 2329939, at *2.

17

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

18

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quotation omitted), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of

the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i) [D]aily activities;
(ii) The location, duration, frequency, and intensity of . . . pain;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v) Treatment, other than medication, . . . received for relief of . . . pain;
(vi) Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). *See also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A). *See also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

## G.   Analysis

Riggs argues that the ALJ erred by finding that canal stenosis of the cervical spine and radiculopathy were severe impairments, but "barely referenc[ing] the pathology in her assessment." (Doc 11 at 10). Further, Riggs argues that "[a]lthough the radiologist's conclusions were precisely described, the ALJ neither addressed the findings, nor provided any insight into how those abnormalities impacted on function." (*Id.* at 11). Riggs concludes that "[s]ince the work identified by the VE was physical, a hypothetical claimant's impaired ability to flex, extend, twist or turn her neck could readily interfere with job performance and might even preclude competitive employment," but that since "none of these functions were included in the RFC," they "were not contemplated by the VE." (*Id.*). In other words, Riggs asserts that the ALJ's failure to include in her RFC assessment those neck limitations caused by canal stenosis and radiculopathy resulted in an inaccurate assessment of her ability to perform work.

As an initial matter, the Court notes the weighty evidence in support of Riggs' assertion that she suffers from numerous painful and limiting maladies, including carpal tunnel syndrome, tendonitis, nerve damage, osteoarthritis, degenerative joint disease, and depression. However, rather than asserting that the ALJ erred in her assessment of the medical evidence regarding each of these ailments, Riggs limits her argument strictly to the ALJ's treatment of her canal stenosis and radiculopathy. It is not this Court's role to decide the case anew. *Cutlip*, 25 F.3d at 286. Arguments which the claimant does not present are waived, thus the Court will only address Riggs' single contention of error. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."); *Robinson v. Comm'r of Soc. Sec.*, No. 11-11267, 2012 WL 4450288, at *7 (E.D. Mich. Sept. 26, 2012) ("[A]rguments that

21

do not involve statutory law or binding case law are waived if Plaintiff did not raise them in her motion for summary judgment."). The Court must merely determine whether the ALJ's decision was supported by substantial evidence. *Sullivan*, 595 F. App'x at 506.

The plaintiff in a Social Security benefits case, not the ALJ, "bears the ultimate burden to prove by sufficient evidence that she is entitled to disability benefits." *Nabours v. Comm'r of Soc. Sec.*, 50 F. App'x 272, 275 (6th Cir. 2002) (citing 20 C.F.R. § 404 .1512(a)). Riggs points to the "radiologist's conclusions" (though she does not identify just which physician she is referring to) and asserts that the ALJ erred by failing to reference that pathology in the decision. (Doc. 11 at 10-11). A review of the medical record suggests that Riggs is most likely referring to either the findings of Dr. Gibson or Dr. Tranchida. In his August 15, 2011, interpretation of a radiological study of Riggs' cervical spine, Dr. Gibson opined that Riggs suffered from "[m]ild to moderate multilevel endplate degenerative changes with osteophytosis and sclerosis worse in the mid and lower cervical spine" along with "[p]rominent disc height loss at C6-C7," and concluded that Riggs suffered from "[m]ild to moderate multilevel degenerative changes." (Tr. 255). Some eight months later, on April 18, 2012, Dr. Tranchida interpreted an MRI of Riggs' cervical spine, finding "[m]ultilevel spondylotic degenerative changes, most advanced at C5-C6 and C6-C7, degenerative changes at these levels result in central canal stenosis and effacement of the spinal cord. A central disc protrusion with slight inferior migration at C5-C6 cannot be excluded and may account for at least some of the ventral cord effacement seen at this level."  (Tr. 250-51). While Riggs does not specifically point to any medical evidence in the record, the Court notes that she complained to Dr. Ossman on August 7, 2012, about pain in her neck, hands, knees, and ankles. (Tr. 367). However,

Riggs also told Dr. Ossman that with medication her pain level was reduced to about three or four out of ten, that her pain was feeling "better" since the last visit, and that her pain relief was "adequate." (Tr. 368).

As severe as these findings sound at first blush, a doctor's diagnosis of a condition generally does not, by itself, establish any limitations resulting from that condition. *See McKenzie v. Comm'r, Soc. Sec. Admin.*, 215 F.3d 1327 (6th Cir. 2000) ("[T]he mere diagnosis of an impairment does not render an individual disabled nor does it reveal anything about the limitations, if any, it imposes upon an individual."). Instead, the ALJ must "consider all symptoms and the extent to which they are supported by medical signs and laboratory findings." *Reed v. Sec'y of Health & Human Servs.*, 908 F.2d 973 (6th Cir. 1990) (citing 20 C.F.R. § 404.1529). The ALJ then considers these factors in light of the claimant's credibility. *See Van Heck v. Comm'r of Soc. Sec.*, No. 06-15233, 2008 WL 1808320, at *4 (E.D. Mich. Apr. 21, 2008) (citing 20 C.F.R. § 416.929(c)(3)).

In this case, Riggs asserted no neck-specific limitations at the various stages of the administrative process, including in her function report or hearing before the ALJ. At the hearing, Riggs testified that she stopped working in part due to "arthritis of the spine" and "a pinched nerve in my neck," but did not describe any neck limitations resulting from those asserted maladies. (Tr. 46). This is in sharp contrast to Riggs' thorough explanation of how her asserted symptoms impacted her walking, lifting, sitting, standing, and grasping abilities, amongst other limitations. (*See*, *e.g.*, Tr. 48-52). Similarly, in her June 2012 function report, Riggs asserted that she cannot work because of difficulty "bend[ing] down because of my back problem [and because] recently my knees are bone to bone," and further clarified that her back

23

problems prevent her from "stand[ing] for long periods of time." (Tr. 184, 186). In terms of personal care, Riggs asserted that she experiences difficulty buttoning clothes and getting in and out of the tub, but did not list any problems associated with her neck. (Tr. 185). Further, Riggs asserted that she is able to ambulate sufficiently well to visit friends in their homes twice monthly, attend church weekly, go shopping twice monthly, and to take short walks each day. (Tr. 48-49, 185, 188). The ALJ properly referenced these activities of daily living in her decision, and noted that they undercut Riggs' asserted level of disability. (Tr. 27-28). Further, the ALJ noted that Riggs appears to have continued her work in a factory after the alleged onset date, and made particular note of Riggs' conflicting testimony regarding the amount of time she worked there.[1] (Tr. 29).

In terms of medical evidence, the ALJ noted that radiological scans revealed only "only mild-moderate degenerative changes in the lumbar spine," in addition to a lack of back tenderness, muscle spasms, difficulty walking, edema, or muscle weakness, contrary to what one would expect from someone suffering severe cervical ailments. (Tr. 30-31). The physician generated RFC assessments of Riggs' condition similarly fail to corroborate limitations consistent with Riggs' purported neck ailments. In particular, Dr. Suleiman's July 12, 2013, RFC assessment simply states "N/A" regarding the frequency with which Riggs can move her neck. (Tr. 416). If Riggs actually suffered from disabling neck ailments, one would expect Dr.

---

[1] Riggs asserted at the hearing before the ALJ that she worked in a factory in 2012 for "maybe a week" (Tr. 44), yet wrote in her function report that she worked in that position between June 2010 and February 2012. (Tr. 192). The ALJ noted this inconsistency, in addition to evidence of Riggs' self-employment as a home care aide and evidence that she injured her hand with a box cutter while working in November 2011, both of which took place after her asserted August 2011 date of disability. (Tr. 29).

Suleiman to record that she could "never" or "rarely" perform these activities. As written, it appears that Dr. Suleiman simply chose not to rate Riggs' neck function because it was not relevant to her asserted ailments at that time. Further bolstering this conclusion, Dr. Alnajjar recorded in his July 13, 2013, RFC assessment that Riggs could "frequently" look down, up, left, right, or hold her head in a static position. (Tr. 421). Stated otherwise, Dr. Alnajjar concluded just a few months before the oral hearing that Riggs suffered no neck limitations whatsoever. Riggs' only other RFC assessment was drafted by Dr. Bijpuria, who found that Riggs' symptoms were "not substantiated by the objective medical evidence alone." (Tr. 311). Riggs thus fails to point to evidence that her severe impairments of canal stenosis and radiculopathy cause disabling symptoms which the ALJ should have included in her RFC assessment.

Insofar as Riggs asserts that the ALJ failed to discuss her neck ailments in sufficient detail, this failure can be attributed to the dearth of evidence in the record supporting such a finding. The ALJ cannot be faulted for failing to include in her RFC assessment limitations which find no support in the medical record, and which the claimant points to only after the ALJ's decision has issued. The Court also notes that, while unnecessary to reach a decision in this case, arguments not raised before the ALJ may be waived. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011) (finding that an ALJ did not err by failing to consider *sua sponte* the issue of obesity when the claimant failed to list it as one of her impairments or present evidence supporting that ailment); *Spuhler v. Colvin*, No. 2:13-CV-12272, 2014 WL 4855743, at *22 (E.D. Mich. June 17, 2014) (collecting cases discussing waiver of issues not raised before the ALJ).

25

Furthermore, as the Commissioner argues in her brief, the ALJ incorporated several restrictions into her RFC assessment to accommodate Riggs' ailments, including a restriction to light work, the ability to sit or stand at will, and limiting postural movements and overhead reaching to an occasional basis. (Tr. 29-31). Riggs points to no evidence which would justify more restrictive limitations.

In sum, the ALJ properly considered the medical evidence, Riggs' asserted limitations, and other relevant evidence in reaching her RFC assessment. She included restrictions to accommodate all those limitations supported by the evidence, and thoroughly discussed Riggs' credibility. Riggs has not pointed to any evidence of disabling symptoms which the ALJ failed to incorporate into the RFC assessment, and has not otherwise pointed to any errors in the ALJ's decision. For these reasons, the Court finds that the ALJ's decision was supported by substantial evidence.

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Riggs' Motion for Summary Judgment (Doc. 11) be **DENIED**, the Commissioner's Motion (Doc. 12) be **GRANTED**, and that this case be **AFFIRMED**.

## III.    REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a

waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: September 29, 2015                   S/ PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 29, 2015                   By s/Kristen Krawczyk
                                           Case Manager to Magistrate Judge Morris